MEMORANDUM OF DECISION
This memorandum of decision addresses a petition brought to terminate the parental rights (TPR) of Shannon L., the biological mother of Dalton G., born June 21, 1996. The Department of Children and Families (DCF) filed the TPR against the respondent mother on May 31, 2001, alleging the sole ground of failure to achieve rehabilitation. On May 23, 2002, this petition was amended to add in Dalton's biological father John G.,[2]
alleging against him the grounds of abandonment, failure to achieve rehabilitation, and lack of an ongoing parent-child relationship. As John G. tendered a valid consent to the TPR, the petition was amended to reflect this ground, but issues related to disposition were left for trial. For the reasons stated below, the court finds these matters in favor of the petitioner.
The memorandum of decision also addresses a TPR petition brought by DCF on May 31, 2001 with regard to Shannon L. and Daniel G. (respondent parents), the biological parents of Sommer G., born June 23, 1999. This petition alleged the sole ground of failure to achieve rehabilitation against each respondent. For the reasons stated below, the court also finds these matters in favor of the petitioner.
Trial of this highly-contested matter took place on July 23, 24, 25, 2002, and September 17, 2002. The petitioner, the children, and the respondent parents were vigorously represented throughout the proceedings.[3] The respondent parents and DCF submitted thorough, comprehensive briefs for the court's review. The parties joined in filing supplemental evidence with the court on October 8, 2002.
The Child Protection Session of the Superior Court has jurisdiction CT Page 2449-b over the pending case, for which notice has been provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of Dalton G. and Sommer G.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study[4] and addendum, and the multiple other documents submitted in evidence which included substance abuse testing and treatment records, court documents, records from the Department of Public Safety, records from a visitation center, correspondence from DCF, and a psychological evaluation. The court has utilized the applicable legal standards[5] in considering this evidence and the testimony of trial witnesses who included a DCF social worker, a psychologist, a probation officer, service providers, Shannon L.'s sister and her sister's fiancé.[6] Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:[7]
 I.A. HISTORY OF THE PROCEEDINGS
DCF has been involved with the respondents since February 1999, when Shannon L. was identified as having problems involving substance abuse, mental health issues, parenting deficiencies and leaving Dalton and Sommer without proper supervision. Daniel G. was identified as having problems with substance abuse, parenting deficiencies and leaving Sommer without proper supervision. (Exhibits 1, 2; Testimony of Paulette M.)
On March 3, 1999, the court (Mack, J.) issued an ex parte OTC for Dalton, removed him from the custody of his mother and vested DCF with his care. (JN-1.) On May 28, 1999, the court (Mack, J.) adjudicated Dalton to be a neglected child and returned him to Shannon L.'s care under protective supervision. (JN-2.) On March 17, 2000, the court (Mack, J.) issued an ex parte OTC for both Dalton and Sommer, and vested DCF with the children's care. (JN-3.) Effective June 1, 2000, the court (Mack, J.) modified the disposition of protective supervision then in effect for Dalton, and committed him to the custody of DCF. Effective June 1, 2000, the court (Mack, J.) adjudicated Sommer to be a neglected child and committed her to the custody of DCF.[8] (JN-6.) Both children have remained in DCF custody since that date, pursuant to orders of the court.
On May 23, 2001, the TPR petitions at issue were filed against Shannon L. and Daniel G. and John G. was added to the TPR petition through an amendment. On May 23, 2002 the court (Lopez, J.) accepted John G.'s consent to the termination of his parental rights regarding Dalton. CT Page 2449-c
 I.B. SHANNON L., THE MOTHER OF DALTON AND SOMMER
Shannon L. was born on September 2, 1973; she has completed the eleventh grade.[9] Her father is an alcoholic. Her mother has a history of heroin addiction and attempted recovery. Shannon L. began using marijuana and alcohol during high school. (Exhibits 7, 16.) She has a significant history of abusing other drugs, having commenced use of cocaine at the age of eighteen, and having commenced use of heroin at age twenty-four. Heroin has remained Shannon L.'s drug of choice. (Exhibit 7.)
Shannon L.'s first child, Pasha D., was born on October 7, 1992 to the respondent mother and Glen D. (Exhibits 1, 7, 16.) Pasha has been in Shannon L.'s custody on only a sporadic basis. (Exhibits 1, 16.)
Dalton G. was born to Shannon L. and John G. on June 21, 1996. Shannon L. ended her relationship with John G. shortly after Dalton's birth. Shannon has admitted to hitting John G. in the head and yelling at him when she became angered. (Exhibits 1, 16.)
Shannon L. met Daniel G. in 1997, and they began a long-term relationship during which respondent mother initially hid her use of heroin from the respondent father.[10] Shannon L. became pregnant with Sommer during late 1998. On February 26, 1999, she started in-patient treatment for her substance abuse at the Stonington Institute (Stonington). However, Shannon L. left that facility, against medical advice, on March 1, 1999. (Exhibits 1, 16.)
DCF began its involvement with Shannon L. in February 1999. The agency filed a neglect petition in March 1999, identifying Shannon L. as an active heroin user who had engaged in treatment unsuccessfully and who had exposed her child to substance abuse. (Exhibit 1.) Subject to the March 1999 OTC, Dalton was adjudicated a neglected child on May 28, 1999, and returned to Shannon L.'s custody under protective supervision. At that time, the court (Mack, J.) imposed specific steps upon Shannon L. to guide her in retaining custody of her son. (Exhibit 17.) Among other things, those steps required Shannon L. to: refrain from substance abuse and avoid involvement with the criminal justice system; participate in individual counseling to address her need to maintain a lifestyle free from substance abuse; submit to substance abuse assessment, testing, and treatment using the services at the Hartford Dispensary, AA and NA, and Family Focus with Addiction Services (FFAS);[11] comply with all conditions of probation; provide appropriate child care and supervision for Dalton; and execute releases permitting DCF to communicate with her CT Page 2449-d service providers to monitor attendance, cooperation, and progress toward identified goals. (Exhibit 17.)
In April 1999, near the end of her pregnancy with Sommer, Shannon L. again commenced methadone maintenance treatment at the HD. Sommer was born to Shannon L. and Daniel G. on June 23, 1999. Almost immediately thereafter, Shannon L.'s drug tests at the HD program demonstrated intermittent but obvious use of opiates and cocaine in addition to methadone. During the latter part of 1999, Shannon L. missed a number of scheduled HD appointments, and then discontinued attendance at the methadone maintenance clinic for the second time. (Exhibit 4.)
In late November 1999, at DCF's referral, Shannon L. began working with the FFAS staff.[12] Although she participated in some sessions, Shannon L. was not available at approximately one fourth of the FFAS meetings, including home visits, that were scheduled through May of 2000; she thereby lost the opportunity to partake in the emotional support that the FFAS caseworker was prepared to provide. Shannon L. did not follow through with her FFAS treatment plan, which required her to engage in individual counseling and attend 12-step meetings. FFAS discontinued its services for Shannon L. in the late spring of 2000, due to her non-compliance. At discharge, the FFAS caseworker discussed with Shannon L. the availability for treatment to address her substance abuse and mental health issues at United Services (US), at the Quinnebaug Day Treatment Center (Quinnebaug), or with her personal physician. Shannon L. attended an intake session at Quinnebaug, but was unwilling to attend further treatment. (Exhibit 9; Testimony of Meg-Ann C.)
In December 1999, DCF filed a neglect petition alleging that Shannon L. had an ongoing addiction, and that she had exposed Sommer to heroin "pre-natally." (Exhibit 1.) On February 16, 2000, when Sommer was six months old, the court (Mack, J.) imposed a second set of specific steps upon Shannon L., to aid her in safely retaining custody of Sommer and Dalton. (Exhibit 18.) Those steps largely reiterated the criteria imposed in May 1999, but also required Shannon L. to: provide appropriate care and supervision to Sommer; utilize the substance abuse evaluation, testing and treatment services at the Center for Behavioral Health (CBH), the Young Parents Program, FAS, AA and NA; and utilize the child care programs at Headstart and EastConn Family Visitation Center (EastConn). (Exhibit 18.)
In yet another effort to manage her substance abuse, Shannon L. began treatment at CBH in December 1999. She was discharged from the program in March 2000 for noncompliance. (Exhibit 1.) CT Page 2449-e
Additional neglect petitions were filed on March 17, 2000, alleging that both Dalton and Sommer were left with inappropriate caretakers. The children entered DCF custody pursuant to an OTC of that date. (Exhibit 1.) As found in Part I.A., effective June 1, 2000, Dalton was found to be neglected, and both children were committed to DCF.
In August 2000, Shannon L. engaged in a third round of methadone treatment at HD. She tested positive for cocaine, opiates and benzodiazepines during this admission, and was discharged on January 1, 2001 due to noncompliance. (Exhibit 1.) On March 2, 2001, Shannon L. was admitted to Stonington for additional in-patient substance abuse treatment. She left that program on March 7, 2001, again against medical advice. (Exhibits 1, 16.)
In the spring of 2001, at the criminal court's referral, Shannon L. was scheduled for group counseling and substance abuse treatment at Community Prevention and Addiction Services (CPAS). After Shannon L. missed a number of sessions and demonstrated continued use of cocaine, opiates, codeine and morphine, CPAS determined that she was noncompliant, and discharged her from the program. Re-admitted to CPAS in the fall of 2001, Shannon L. again failed to attend scheduled appointments. (Exhibit 3.)
During April and May of 2001, Shannon L. and Daniel G. attended visitation sessions with a parenting education component at EastConn. The children appeared to be excited at the commencement of visits, and greeted the respondents with enthusiasm. The EastConn staff used a curriculum involving discussion, videotapes and modeling exercises to help improve the respondents' parenting skills; during visits, supervised play activities and parent coaching were also employed. In discussions with the visitation specialist, Shannon L. seemed to understand basic parenting concepts. However, she was sometimes unable to apply appropriate behavior management techniques to her children, sometimes causing them disappointment.[13] (Exhibit A.)
After a detox stay at Meridian Hill, Shannon L. received in-patient treatment at McDonough House from July 6 through July 31, 2001, in yet another effort to address her dual diagnosis of substance abuse and mental health issues. She received anti-depressants and was advised to pursue out-patient treatment after discharge. However, other than attending NA and AA meetings for a short duration, she failed to comply with the McDonough House recommendations for follow-up care. (Exhibit 2; Testimony of Paulette M.) DCF also referred Shannon L. to New Perceptions for hair analysis to determine whether she was using illegal drugs; however, Shannon L. failed to participate with that provider. (Testimony CT Page 2449-f of Paulette M.)
On October 11, 2001, Shannon L. underwent a court-ordered individual evaluation performed by Robin Grant-Hall, a licensed clinical psychologist who has long experience with child protection matters. Dr. Grant-Hall noted Shannon L.'s history of injecting heroin and failed efforts at drug treatment programs; problems with depression and anxiety, and her use of prescription medications Valium, Buspar and Trazodone; use of controlled painkillers for reported somatic complaints; use of crystal methamphetamine following Dalton's birth, when the respondent was living in Oklahoma; and involvement in a fight with Daniel G. at a bar, which led to her children's current foster care status. Psychological assessment revealed Shannon L. to be an immature, dependent woman who struggles with significant drug addiction problems, agitated depression, and severe, chronic anxiety.[14] She has unrealistic claims of virtue, is inhibited, and uses denial and repression as her primary defenses against the anxiety that often overwhelms her. As strengths, Dr. Grant-Hall's testing revealed that Shannon L. "has adequate parenting skills. She values the need for structure as well as consistent rules and consequences." (Exhibit 16.) At the time of the evaluation, Dr. Grant-Hall reported that Shannon L. felt quite guilty about her dilemma, and that she was "currently immobilized with depression and anxiety leaving little energy for the normal demands of life." (Exhibit 16.) Acknowledging her problems with drugs and alcohol, Shannon L. also expressed her recognition that to regain custody of her children, she would "need to get a grip on this addiction . . . [and] need to get counseling." (Exhibit 16.) At the evaluation, Dr. Grant-Hall specifically "informed [Shannon L.] that she could pursue therapy on her own at her local mental health center." (Exhibit 16.)
On November 1, 2001, Dr. Grant-Hall conducted a court-ordered interactional evaluation of Shannon L. and both children, who appeared happy to see their biological mother. Throughout the session, Shannon L. "was excellent at providing positive reinforcements to the children." (Exhibit 16.) However, the respondent mother lacked the ability to set firm limits in an appropriate way, and had limited ability to guide the children in their behavior. Dr. Grant-Hall suggested "that DCF outline a very specific plan for [Shannon L.] that she has to accomplish in the next six months." (Exhibit 16.) The psychologist identified ten specific goals in her written report dated November 15, 2001, including Shannon L.'s entry into a substance abuse dual diagnosis treatment program, and procurement of a psychiatric medical consultation for anti-depressant and anti-anxiety medication. Dr. Grant-Hall expressly stated that "[Shannon L.] needs to complete the designated goals on her own without assistance from [Daniel G.]." (Emphasis added.) (Exhibit 16.) To allow Shannon L. to CT Page 2449-g focus on addressing her substance abuse issues and rehabilitation, Dr. Grant-Hall recommended that visitation with the children should be reduced from twice weekly to once per week. (Exhibit 16.)
On December 4, 2001, Shannon L. was convicted of one count of Prostitution and one count of Conspiracy to commit Larceny in the sixth degree; she was sentenced to one year of incarceration, suspended, and commenced two years of probation. Her conditions of probation mirrored the existing steps imposed by the Juvenile Court, requiring her to engage in substance abuse treatment and testing, to undergo counseling, and to refrain from possessing illegal drugs. The Office of Adult Probation (OAP) referred Shannon L. to the HD to address her substance abuse issues and in December 2001, she registered at that facility for a fourth attempt at methadone treatment. Drug testing prior to admission had indicated her confirmed use of illegal opiates. Again, despite methadone maintenance therapy, Shannon L. tested positive for opiates and cocaine on multiple occasions in January and February 2002. (Exhibit 6.) Although the HD staff recommended psychiatric evaluation and treatment, Shannon L. failed to follow through with this referral; the HD staff reported that the respondent mother appeared "to have minimal understanding of her role in recovery." (Exhibit 7.) Shannon L. missed a number of scheduled methadone doses, as well. (Court Exhibit 2.) On February 21, 2002, HD discharged Shannon L. for non-compliance.[15] (Exhibit 7.)
Despite meaningful efforts to secure her attendance, Shannon L. failed to attend three separate scheduled meetings with her probation officer. Shannon L. admitted to using cocaine and heroin during the initial part of her probation. The OAP subsequently referred Shannon L. to the Alternative to Incarceration Center (AIC) so that a residential drug treatment center could be found for her. The AIC directed Shannon L. to present herself at a hospital, where transportation to residential treatment ADRC was available for her. However, Shannon L. failed to comply with this direction. In March 2002, a warrant was prepared, charging her with Violation of Probation. (Testimony of Julie C.)
On December 12, 2001, the court (Mack J.) imposed a third set of specific steps upon Shannon L., to aid her in regaining the custody of Dalton and Sommer. (Exhibit 19.) These steps largely reiterated the steps issued in May 1999 regarding Dalton, and the steps imposed in February 2000 regarding both children. (Exhibits 17, 18.) These steps also required Shannon L. to: participate in parenting and family counseling, as well as individual counseling, to address her parenting, mental health, and substance abuse issues; cooperate with the children's therapy; visit with the children; and follow Dr. Grant-Hall's ten specific recommendations.[16] (Exhibit 19.) CT Page 2449-h
Shannon L. has acquired a number of criminal convictions during recent years.[17] In re Helen B., 50 Conn.App. 818, 819, 719 A.2d 907
(1998) (respondent parent's arrests are relevant evidence of parenting capacity, even where arrests do not result in conviction). In February 1999, when Dalton was a toddler and Shannon L. was in the last stages of her pregnancy with Sommer, she was found to be in possession of narcotics, and was arrested for this offense and writing a bad check.[18]
In March 1999, Shannon L. was arrested for Larceny in the sixth degree. In March 2000, when Sommer was still in her care, Shannon L. was charged with Breach of Peace; she was convicted of a substitute offense, Interfering with a Police Officer, on May 16, 2000. In September 2001, Shannon L. was arrested and charged with Prostitution. As found above, in December 2001, she was convicted of this offense and the pending Larceny charge, and received a suspended sentence and probation. In May 2002, just months prior to commencement of her TPR trial and while both specific steps and conditions of probation were in effect, Shannon L. was arrested and charged with Possession of Drug Paraphernalia. That matter was pending at the time of trial, along with failure to appear charges, and a pending probation violation. (Exhibit 24.)
The court had the opportunity to observe Shannon L.'s demeanor throughout the course of trial.[19] On July 23, 2002, she appeared to doze off on many occasions throughout the latter part of the morning session, and again in the afternoon. To her credit, Shannon L. provided a random urine specimen so the bail commissioner could promptly perform a drug screen. The test results indicated the presence of marijuana, amphetamines, cocaine and morphine.[20] (Testimony of Chris M.) During the afternoon session on July 24, 2002, Shannon L. again appeared to be dozing.
 I.C. DANIEL G., THE FATHER OF SOMMER
Daniel G. was born on November 14, 1976. Daniel G. earned his GED while incarcerated. He has worked at different restaurants, as a janitor, and in construction. Currently, he is engaged in the roofing trade and in construction work with his father. (Exhibits 1, 16.)
As previously found, Daniel G. and Shannon L. began their long-term relationship in 1997. Daniel G. claims that Shannon L. initially hid her heroin use, even though the respondent mother spent a few days at Stonington in the winter of 1999. Dalton lived with the respondent parents, whose daughter Sommer was born on June 23, 1999. (Exhibits 1, 16.) CT Page 2449-i
In December 1999, DCF filed a neglect petition alleging that Daniel G. was unable to ensure the safety of Sommer, who was being exposed to Shannon L.'s persistent substance abuse. (Exhibit 1.) On February 16, 2000, when Sommer was six months old, the court (Mack, J.) imposed specific steps upon Daniel G. to aid him in regaining custody of his daughter. (Exhibit 21.) Among other things, those steps required Daniel G. to: refrain from substance abuse and avoid involvement with the criminal justice system; participate in individual and family counseling regarding substance abuse issues through Al-Anon, US or CBH; submit to substance abuse assessment, testing, and treatment at CBH; comply with probation; and execute releases permitting DCF to communicate with his providers to monitor attendance, cooperation, and progress. (Exhibit 21.)
In the past, Daniel G. has had problems with anger and aggression, leading to violence against persons and property when he was under the influence of substances.[21] (Exhibits 1, 16.) Daniel G. underwent a substance abuse evaluation on March 14, 2000, during which he admitted that he became involved in altercations after drinking. (Exhibit 1.) A hair test conducted on March 22, 2000 was positive for marijuana. (Exhibit 1.)
OTCs were ordered in March 2000, as found in Part I.A., and the children were removed from the respondents' care. Neglect petitions filed on March 17, 2000 alleged that Daniel G. allowed or permitted Shannon L. to supervise Dalton and Shannon while she was using and/or under the influence of drugs. (Exhibit 1.)
DCF referred Daniel G. to US for substance abuse testing evaluation and treatment. During his first sessions in April 2000, the US staff found that Daniel G. "minimizes his relationship to alcohol (reporting non-problematic use) and marijuana" and noted his past problems with anger.[22] (Exhibits 11, 12.) US provided weekly group sessions and individual counseling to assist Daniel G. in remaining abstinent from alcohol and marijuana, learning about Shannon L.'s methadone use and facilitating her recovery. (Exhibit 11; Testimony of Linda L.) Although Daniel G. attended some of the weekly individual therapy or group counseling sessions that were offered to him at US from April 2000 through the end of that year, he canceled or failed to attend a number of sessions as well, and failed to attend any of the five appointments scheduled for him in January 2001. US terminated Daniel G. from the program, determining that he had "dropped out of treatment" before reaching his agreed-upon goal of remaining totally alcohol and drug free for ninety consecutive days.[23] (Exhibits 1, 11, 12; Testimony of Linda L., Paulette M.) Although Daniel G. contacted US and asked to be readmitted to treatment, US was unsuccessful in its attempts to reach him CT Page 2449-j to schedule an appointment. (Exhibit 12.)
With Shannon L., Daniel G. attended visitation sessions at EastConn during April and May of 2001, as found in Part I.B. In parent-education sessions held at each visit, the EastConn staff used a curriculum involving discussion, videotapes and modeling exercises to help improve the respondents' parenting skills; during visits, supervised play activities and parent coaching were also employed. Dalton and Sommer greeted the respondents with enthusiasm, and appeared to be excited at the commencement of visits, during which they enjoyed age-appropriate activities and positive communication with the respondents. In discussions with the visitation specialist, Daniel G. seemed to understand basic parenting concepts. However, he was sometimes unable to apply behavior management techniques to Sommer and Dalton, occasionally causing the children to be disappointed.[24] (Exhibit A.)
Daniel G. failed to attend an appointment scheduled for him to undergo a hair analysis test for substance abuse in May of 2001, and failed to reschedule the appointment. (Exhibits 1, 2.)
On November 1, 2001, Dr. Grant-Hall performed a court-ordered psychological evaluation of Daniel G.[25] Although the respondent father "adamantly denied past or current drug or alcohol abuse" his test results showed that the respondent father "had an extremely high score on the addiction proness indicators which suggested the possible development of an addiction," consistent with the US records which had demonstrated Daniel G.'s positive screens for methadone, marijuana and morphine in the past.[26] (Exhibit 16.) Daniel G. was also found to have adequate parenting knowledge, but Dr. Grant-Hall credibly opined that he "needs to learn more about developmental issues and appropriate rules and consequences" in order to be able to effectively manage a child's behavior. (Exhibit 16.) In the interactional evaluation performed with Sommer on that day, the child was relatively comfortable with Daniel G. only when Shannon L. was present and available to her. While noting that Sommer should not be returned to the sole care of the respondent father in the near future, Dr. Grant-Hall recommended that "[Daniel G.] should be given a list of expectations which he would need to accomplish in the next six months." (Exhibit 16.) The psychologist identified nine specific expectations in her written report dated November 15, 2001, including abstinence; drug screens; substance abuse evaluation and treatment; and remaining "free of any legal problems, complaints, or arrests." (Exhibit 16.) For Daniel G., Dr. Grant-Hall also recommended that visitation be held only once per week. (Exhibit 16.)
On December 12, 2001, the court (Mack, J.) imposed a second set of CT Page 2449-k specific steps upon Daniel G. to aid him in regaining custody of Sommer. (Exhibit 20.) These steps largely reiterated the steps issued in February 2000, but also required this respondent to participate in parenting as well as individual and family counseling; cooperate with the child's therapy; visit with the child; and follow Dr. Grant-Hall's nine specific recommendations, appended to the steps.[27] (Exhibit 20.)
On January 10, 2002, a hair test was scheduled for Daniel G. Although the respondent father informed the test facility that he would be present as scheduled, he failed to attend. A follow-up appointment was scheduled to take place on February 6, 2002. However, Daniel G. failed to subject himself to this hair test, as well.[28] In January, February and March 2002 Daniel G. was screened for drug use as a part of his work with the Alternative Incarceration Center (AIC), under the direction of the criminal court. Each of these tests demonstrated that he was actively using drugs. To address Daniel G.'s continued substance abuse issues, the AIC referred him to drug treatment at SCADD. He underwent detox at SCADD, but refused to comply with SCADD's recommended in-patient treatment process, and left the facility against medical advice. (Exhibit 2.)
Daniel G. has engaged in criminal activity and acquired a number of criminal convictions on almost a yearly basis. Many of his convictions relate to failure to appear for court hearings, and failure to obey court orders of probation.[29] In re Helen B., supra, 50 Conn.App. 819. In December 1994, Daniel G. was arrested and charged with Assault in the third degree; on February 1, 1995, he was convicted of this offense and sentenced to one year in jail, suspended, with one year of probation. In October 1996, he was charged with Possession of Marijuana;[30] on February 11, 1997, he was convicted and ordered to pay a $200 fine. In March 1998, when Daniel G. was living with Shannon L. and Dalton, Daniel G. was arrested for Criminal Mischief in which he had engaged in February 1998; he was convicted of this offense on September 24, 1998 and was ordered to pay a $100 fine. He was arrested for Failure to Appear in the second degree in connection with a hearing scheduled for September 28, 1998; on November 23, 1998, Daniel G. was convicted of this offense, and received an unconditional discharge. On March 16, 2001, after Sommer was born and while his first set of specific steps were in place, Daniel G. was arrested and charged with Larceny in the sixth degree for an offense that occurred that date.[31] In April 2001, Daniel G. was charged with Larceny in the degree, relating to an incident that had occurred in January 2001.[32] He was charged with Failure to Appear in the second degree when he did not respond to his outstanding charges on May 8, 2001. He was again charged with Failure to Appear in the second degree when he did not respond to his outstanding charges on May 22, 2001. In CT Page 2449-l June 2001, Daniel G. was charged with Interfering with an Officer, relating to an offense that had occurred on May 31, 2001.[33] On July 5, 2001, Daniel G. was convicted of Failure to Appear and sentenced to one year in jail, suspended, with two years of probation; he was also convicted of the Interfering charge and sentenced to serve one year, suspended after three months, consecutive to his other sentences, with two years of probation. On July 10, 2001, Daniel G. was convicted of the outstanding Larceny and Failure to Appear Charges and was sentenced to serve forty-five days in jail, consecutive to his other sentences. On January 30, 2002, Daniel G. was charged with Possession of Narcotics;[34]
when he did not attend the court appearance scheduled for March 25, 2002, he was charged with Failure to Appear in the First Degree. On May 16, 2002, Daniel G. was charged with Violation of Probation; on July 31, 2002, upon conviction for this offense, his existing Failure to Appear sentence was modified, requiring him to serve six months in jail, followed by two years of probation. On July 31, 2002, he was convicted of the felony Failure to Appear charge and sentenced to six months in jail. (Exhibit 23.)
 I.D. THE CHILDREN
On March 17, 2000, both three-and-a-half-year-old Dalton and nine-month-old Sommer were placed in the foster home of Cherie and David H., where they have remained. Both Dalton and Sommer are well adjusted in this placement, and they play well with their foster parents' two biological children. The foster parents treat Dalton and Sommer with love and affection; they would like to adopt the siblings if the TPR petition is granted. (Exhibits 1, 16; Testimony of Paulette M.)
 I.D.1. DALTON G.
Dalton was born on June 26, 1996.[35] When Dalton was nearing his third birthday, Shannon L. was arrested for a misdemeanor, and the child was placed in DCF custody through an ex parte OTC issued March 3, 1999. (Exhibit 1.) The OTC was sustained on April 30, 1999. Dalton was adjudicated neglected and returned to his mother's care under protective supervision on May 28, 1999. (Exhibits 1, 16.) Through an OTC dated March 17, 2000, Dalton was again removed from Shannon L. and placed in DCF's care. Effective June 1, 2000, his protective supervision was modified by the court and he was committed to DCF custody.
In November 2001 when Dr, Grant-Hall assessed Dalton's interaction with Shannon L., the child frequently asked about "Danny." The psychologist concluded that Dalton "obviously feels a connection to [Daniel G.]" and that Dalton then looked forward to reunification. (Exhibit 16.) CT Page 2449-m
Dalton encountered difficulty transitioning back to his foster home after visits with his mother.[36] He had been described as hypervigilant and anxious about change. (Exhibits 1, 22.) From November 2001 to January 2002, Dalton attended therapy to assist him in expressing his feelings and thoughts in age-appropriate ways. Therapy was discontinued as Dalton no longer displayed any clinical symptoms. (Exhibits 2, 22.)
 I.D.2. SOMMER G.
Sommer was born on June 23, 1999.[37] The infant showed signs that she had been exposed to methadone in utero. (Exhibit 1.) As found in Part I.A., on May 17, 2000, when the child was nine months bid, the court issued an OTC for Sommer, removing her from the care of Shannon L. and Daniel G. Sommer was adjudicated a neglected child and committed to DCF custody effective June 1, 2000. (Exhibit 16.) Sommer has received Birth-to-Three services to support her speech development. (Exhibits 2, 16.)
 II. ADJUDICATION
In the adjudicatory phase of this hearing,[38] the court has considered the evidence related to circumstances and events prior to May 23, 2001, the date upon which the TPR petitions against Shannon L. and Daniel G. were filed, and has also considered the evidence and testimony related to circumstances occurring through the close of trial.[39] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to each respondent.
 II.A. REUNIFICATION EFFORTS[40]
It is axiomatic that "[b]efore a court may grant a petition to terminate parental rights on the basis of a parent's failure to achieve a sufficient degree of personal rehabilitation, the court must find by clear and convincing evidence that the department has made reasonable efforts to reunite the child with the parent. General Statutes (Rev. to 1999) § 17a-112(c)(1), now (j)(1)." In re Amneris P., 66 Conn.App. 377,386, 784 A.2d 457 (2001). "`In accordance with [§ 17a-112(j)(1)], the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate.' In re William R. III, 65 Conn.App. 538, 546, 782 A.2d 1262
(2001)." In re Ebony H., 68 Conn.App. 342, 348, 789 A.2d 1158 (2002). CT Page 2449-n Here the court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts[41] were made to reunify Shannon L. with her children, and Daniel G. with Sommer, as is required by General Statutes § 17a-112(j)(1). Furthermore, based on the clear and convincing evidence produced at trial, the court now finds that, under the circumstances of this case, both Shannon L. and Daniel G. are either unable or unwilling to benefit from reasonable reunification efforts. § 17a-112(j)(1).
From the time the children entered into foster care in March 2000 through the time of Dr. Grant-Hall's evaluations in the fall of 2001, DCF provided twice-weekly supervised visitation between the respondents and their children; thereafter, upon the psychologist's recommendations, visits took place once a week. Transportation was provided to the parents to assist them in going to and from visits. (Exhibit 1.)
 II.A.1. SHANNON L.
The clear and convincing evidence presented in this case establishes that DCF provided Shannon L. with reasonable efforts through timely, repeated and appropriate opportunities for the substance abuse treatment and mental health services necessary for effective reunification with her children. In addition, the respondent mother was offered corollary services, with psychiatric evaluation and treatment offered through the OAP, and she procured some treatment on her own.[42]
A chronological summary of Shannon L.'s involvement in services, detailed in Part I.B., indicates the depth and persistence of efforts extended to this respondent as a valid means of addressing her underlying substance abuse, parenting and mental health issues; this review further reveals that notwithstanding these efforts, the respondent mother nearly always either failed to follow through with proffered services, or was discharged by the providers for lack of compliance.[43] Shannon L. had participated in methadone maintenance treatment at the HD in 1997, prior to DCF's involvement with the family. In the winter of 1999, she briefly attended inpatient treatment for her substance abuse at Stonington, but she left against the provider's advice. Shannon L. again briefly participated in substance abuse treatment at HD from spring through fall 1999, but prematurely left the program. From November 1999 through spring 2000, FFAS extended support services to Shannon L., with referrals to 12-step meetings and individual counseling, but the respondent mother failed to comply with this program.[44] From December 1999 through March 2000, Shannon L. was provided with access to substance abuse treatment at CBH, but she was discharged due to noncompliance. In the spring of 2000, DCF referred Shannon L. to mental health and substance CT Page 2449-o abuse treatment at Quinnebaug; while she attended an intake session, the respondent mother was unwilling to attend treatment. In August 2000, she again engaged in substance abuse treatment at HD, but was discharged in January 2001 due to noncompliance. In March 2001, Shannon L. again entered Stonington for residential substance abuse treatment, but she left this program a few days later, against medical advice. In the spring and again in the fall of 2001, through OAP, Shannon L. was scheduled for group counseling and substance abuse at CPAS, but she failed to attend scheduled appointments. Shannon L. failed to attend a hair test scheduled at New Perceptions. During July 2001, after a detox process at Meridian Hill, Shannon L. participated in in-patient treatment at McDonough House, where she was prescribed psychiatric medications and advised to pursue out-patient treatment. However, other than briefly attending NA and AA meetings, Shannon L. failed to comply with McDonough House's recommendations for follow-up care. In December 2001, OAP referred Shannon L. back to substance abuse treatment at the HD, but she failed to satisfactorily comply with the provider's conditions, specifically declining the opportunity for a psychiatric evaluation and referral. In the winter of 2002, through an OAP referral, a bed was provided for Shannon L. at the ADRC, offering another opportunity for substance abuse treatment, but again she failed to comply. (Exhibits 1, 2, 3, 4, 6, 7, 9, 16, A; Court Exhibit 2; Testimony of Julie C., Linda L., Paulette M.)
Even if it could be found that DCF failed to provide reasonable efforts at reunifying Shannon L. with her children, the evidence clearly and convincingly establishes that this respondent is unable or unwilling to benefit, under the circumstances of this case, from such services as are contemplated by § 17a-112(j)(1). Shannon L.'s continued involvement with drugs and related unlawful activity, throughout the course of DCF's involvement with her family, impels the conclusion that her chronic substance abuse remains the respondent's priority in life, rendering her persistently unable or unwilling to take full advantage of the multiple rehabilitation efforts offered to her. The evidence is replete with references to Shannon L.'s attempts and failures at achieving reasonable control over her heroin addiction and substance abuse issues prior to the filing of the TPR petition against her on May 31, 2001. She was unwilling or unable to participate in the mental health services proffered her at Quinnebaug or the meaningful follow-up care recommended by McDonough House. She avoided the psychiatric evaluation that was available to her through HD, where she sporadically participated in substance abuse treatment at her own initiative, and pursuant to court order. As found above, except for her relatively salutary performance in visitation settings, Shannon L. has persistently demonstrated her unwillingness or inability to complete the multiple recovery programs that have been made available to her. Furthermore, she persisted in criminal activity such as CT Page 2449-p prostitution and possession of drug paraphernalia even when she was subject to criminal and juvenile court orders prohibiting this conduct.
Plainly put, the evidence clearly and convincingly reveals that Shannon L.'s drug use is itself so entrenched that she is unable or unwilling to benefit from reunification services. As set forth in Part I.B., when Shannon L. presented herself at the HD for methadone treatment in early December 2001 she had recently used illegal opiates. Despite methadone maintenance therapy, Shannon L. used opiates and cocaine on multiple occasions in January and February 2002. (Exhibit 6.) On February 21, 2002, HD discharged Shannon L. for non-compliance. (Exhibit 7.) Even the threat of a year of incarceration, to which she was exposed if she failed to meet the conditions of her probation, failed to effectively motivate Shannon L. to achieve rehabilitation; she was refractory despite the earnest efforts of her probation officer who secured a referral to the ADRC, where residential drug treatment was available. (Testimony of Julie C.) Shannon L.'s continuation of her substance abuse pattern was evinced by her possession of drug paraphernalia in May 2002. Reviewing the evidence in its totality, it is clearly and convincingly apparent that DCF's reunification efforts were thwarted by the respondent's own inability or unwillingness to benefit from services, not by the "conduct of the department."[45] In re Amelia W., 62 Conn.App. 500, 506,772 A.2d 619 (2001); see In re Ebony H., supra, 68 Conn.App. 350.
Shannon L. vigorously argues that DCF failed to make reasonable efforts at reunification because it denied her referrals to appropriate service agencies. DCF has taken the position that it was unable to make such referrals because Shannon L. failed to execute appropriate release forms.[46] As discussed above, a court order was in effect from May 23 through December 12, 2001 excusing DCF from extending reunification efforts to Shannon L. However, at all other pertinent times, the court finds that DCF could and should have complied with its explicit, unambiguous obligation to provide reasonable efforts to the respondent parent, as clearly contemplated by § 17a-112(j)(1). As found in Part I.B., the respondent mother's execution of release forms was mandated by the specific steps that the court imposed upon her in March 1999, February 2000 and again in December 2001. Although Shannon L. failed to satisfactorily comply with the court's directives, she never sought modification of this court-imposed obligation. Nonetheless, there is insufficient evidence from which the court could reasonably conclude that DCF was excused from referring Shannon L. to service providers on the basis that she had failed to execute the releases in question. The department's obligation to provide reasonable reunification efforts is stilled only by statutorily sanctioned action of the court, not by a parent's failure to comply with a specific step. See, e.g., General CT Page 2449-q Statutes § 17a-11, § 17a-111b; § 46b-129(k)(2).
In responding to this aspect of Shannon L.'s argument, the court does not condone the respondent mother's failure to comply with a court order, DCF's attempt to shield itself from the provision of reasonable efforts by disingenuously relying upon Shannon L.'s lack of cooperation in the execution of releases, or the failure of either party to request a hearing to resolve this issue long prior to the TPR trial. However, the clear and convincing evidence establishes that Shannon L. received abundant opportunities to utilize services from a wide number of agencies while DCF has been engaged with her family, as fully set forth above and in Part I.B. The record abounds with clear and convincing evidence establishing that DCF adequately complied with its statutory obligation to provide reasonable efforts at reunifying Shannon L. and her children, and further establishes that the respondent mother was unable or unwilling to benefit from such efforts. Under these circumstances, and in the absence of relevant law supporting the respondent mother's argument, the issue of the releases can have no measurable effect upon the petitioner's ability to meet its burden of proving compliance with §17a-112(j)(1).
Shannon L. may claim that DCF failed to provide reasonable efforts at reunification in her case because the agency failed to fully adhere to the suggestions made in Dr. Grant-Hall's November 2001 report, calling upon the agency to outline a plan consisting of specific goals for her to complete within six months. This claim must fail for several reasons. First, Dr. Grant-Hall's goals were specifically incorporated into the specific steps delivered by the court on December 12, 2001. (Exhibit 19.) Second, insofar as a referral for a psychiatric and medication consultation was concerned, this service was specifically tendered to Shannon L. by the HD during her involvement with that service provider from December 2001 through February 21, 2002.[47] (Exhibit 7.) Thus, although DCF never directly referred Shannon L. for a psychiatric evaluation following Dr. Grant-Hall's evaluation, an equivalent service was made available to her, and she refused to cooperate with that referral.[48] (Testimony of Paulette M.) Under all the circumstances and given Shannon L.'s failure to cooperate with other services or to honor even the obligations of her probation imposed by the criminal court, it would have been unnecessarily duplicative and therefore unnecessary for DCF to have made a similar referral. In re Antony B.,supra, 54 Conn.App. 476. Third, Shannon L. was arrested and charged with Possession of Drug Paraphernalia in May 2002, having violated the laws of this state notwithstanding the grave implications of the probation to which she was assigned after her December 2001 conviction for Prostitution and Conspiracy to Commit Larceny. Thus, as the court has CT Page 2449-r already concluded, the evidence clearly and convincingly establishes that Shannon L. was unable or unwilling to meet Dr. Grant-Hall's expectations, even if DCF had related them to the respondent mother, due to her continued drug use and related unlawful activity.
Shannon L. may also argue that DCF failed to undertake reasonable efforts at reunification under the analysis utilized in In re VincentB., 73 Conn.App. 637 (2002). Salient factual distinctions, however, render the Vincent B. result inapposite to the present matter.[49] InVincent B., the Appellate Court found that other than visitation, "the department had made no efforts at reunification at all" when it could and should have promoted the reunion of the father and child at issue, and that DCF had made a calculated decision "not to engage in further efforts to reunify [the child at issue] with the respondent . . . based on its prior experiences with the respondent . . ." Id., 643. In the present case, DCF met the Vincent B. test of extending reasonable efforts to reunite Shannon L. and her children. Notwithstanding Shannon L.'s dismal record of compliance with substance abuse treatment, DCF continued its attempts at reunification by offering the FFAS program, Quinnebaug's mental health services, the EastConn parenting education program, and drug treatment and evaluation coordinate with services provided by OAP, in addition to scheduling regular visitation. DCF's obvious efforts, and the respondent mother's inability or unwillingness to benefit from reunification services, render this matter so distinct from Vincent B.
that the court's assessment of reasonable efforts in Shannon L.'s case is not dictated by the result in that matter. Our courts have recognized that DCF cannot force a respondent to either participate in services or to finish a program successfully. See, e.g., In re Steven N.,57 Conn.App. 629, 635, 749 A.2d 678 (2000). Here, where Shannon L. embarked upon reasonably proffered rehabilitation programs but failed to adequately complete them, and where she has further been found to be unable or unwilling to benefit from reasonable reunification efforts, DCF has met its burden of proving the element set forth in § 17a-112(j)(1) by clear and convincing evidence.
 II.A.2. DANIEL G.
The clear and convincing evidence presented in this case also establishes that DCF reasonably provided Daniel G. with reasonable efforts through timely opportunities for the substance abuse treatment and parenting assistance which was necessary for his reunification with Sommer. However, such efforts were rendered unsuccessful by Daniel G.'s persistent involvement in unlawful activities and resultant obligations to the criminal court.[50] In addition, the respondent father was offered substance abuse treatment through the OAP, although he failed to follow CT Page 2449-s through with the recommended services.[51]
A chronological summary of Daniel G.'s involvement in services, detailed in Part I.C., indicates the depth and persistence of efforts to assist this respondent in addressing his underlying substance abuse issues; this review further reveals that with notwithstanding these efforts, the respondent father consistently either failed to follow through with proffered services, was discharged for lack of compliance, or engaged in criminal activities which rendered him unavailable to the providers. In the spring of 2000, DCF referred Daniel G. to US for substance abuse testing, evaluation and treatment. Although he there had the opportunity for treatment by a CADAC certified substance abuse counselor, Daniel G. failed to cooperate with the program. His performance was marred by his denial of any need for attention to drug, alcohol or anger issues, and he was discharged from this program in January 2001 for non-compliance, continued drug use, and lack of attendance. In January and March 2001, Daniel G. engaged in criminal activity that led to his arrests for misdemeanor Larceny and Breach of Peace; he acquired additional charges on two occasions in the spring of 2001 for failing to appear in court as ordered. In the spring of 2001, DCF offered Daniel G. opportunities for substance abuse testing, to assist him in facing the reality of his drug problem. However, Daniel G. did not participate in this process. In early summer 2001, he again engaged in misdemeanor criminal activities, and received suspended sentences. In the summer of 2001, he was convicted of Interfering with an Officer, Larceny and Failure to Appear charges, and received sentences of incarceration. (Exhibits 1, 2, 11, 12, 23; Testimony of Paulette M.)
After release from jail, Daniel G. was arrested for Possession of Narcotics in January 2002, indicating his continued involvement with that prohibited activity. In accordance with the recently imposed specific steps of December 2001, DCF renewed its efforts to direct Daniel M. to substance abuse treatment. During visits with the children at the DCF office, Paulette M., the family's social worker, arranged for his substance abuse evaluation and screening to take place at US. Although the respondent father still declined to participate in these assays,[52]
he underwent substance abuse tests in January, February and March 2002 under the auspices of the AIC, yielding positive indication that he was still using drugs.[53] The AIC referred Daniel G. to the SCADD substance abuse treatment program to address his manifest substance abuse problem. Unfortunately, although the respondent father participated in the initial detox offered through SCADD, he refused to continue with the recommended in-patient treatment, and left the facility against medical advice. Daniel G. was again incarcerated in May 2002, and remained incarcerated through the time of trial, leaving DCF unable to provide him CT Page 2449-t with reunification services other than visitation during that period.[54]
(Exhibits 1, 2, 11, 12, 23; Testimony of Paulette M.)
Even if it could be found that DCF failed to provide reasonable efforts at reunifying the respondent father with Sommer, the evidence clearly and convincingly establishes that Daniel G. is unable or unwilling to benefit from such reunification services. The evidence is replete with indicia of Daniel G.'s continued unlawful activity and repeated incarcerations, occurring throughout the course of DCF's involvement with his family, rendering him consistently unavailable and therefore unable or unwilling to take full advantage of the reunification efforts that were offered to him. The evidence as set forth in Part I.C. relates Daniel G.'s criminal acts, convictions, and incarcerations prior to the filing of the TPR petition against him on May 31, 2001. Daniel G. was incarcerated while serving his sentences in 2001 and again in 2002. His 2002 incarceration rendered him effectively unable to access appropriate services and concomitantly unavailable to complete many of the goals set forth by Dr. Grant-Hall in her November 2001 evaluations, incorporated into the December 2001 specific steps. (Exhibit 20.) Viewed in its totality, the evidence clearly and convincingly reflects that DCF's reunification efforts were thwarted not by the "conduct of the department," but by Daniel G.'s own continued misconduct, and his fundamental inability or unwillingness to access or to timely benefit from services. In re AmeliaW., supra, 62 Conn.App. 506; In re Ebony H., supra, 68 Conn.App. 342; see also In re Amneris P., supra, 66 Conn.App. 385.
Like Shannon L., Daniel G. argues that DCF failed to make reasonable efforts at reunification because it denied him referrals to appropriate service agencies. DCF has taken the position that it was unable to make such referrals because Daniel G. failed to execute appropriate release forms.[55] As discussed above, a court order was in effect from May 23 through December 12, 2001 excusing DCF from extending reunification efforts to Daniel G. However, at all other pertinent times, the court finds that DCF could and should have complied with its explicit, unambiguous obligation to provide reasonable efforts to the respondent parent, as clearly contemplated by § 17a-112(j)(1). As found in Part I.C., the respondent father's execution of release forms was mandated by the specific steps that the court imposed upon him in February 2000 and again in December 2001. Although Daniel G. failed to satisfactorily comply with the court's directives, he never sought modification of this court-imposed obligation. Nonetheless, there is insufficient evidence from which the court could reasonably conclude that DCF was excused from referring Daniel G. to service providers on the basis that he had failed to execute the releases in question. As previously discussed, the department's obligation to provide reasonable reunification efforts is CT Page 2449-u stilled only by statutorily sanctioned action of the court, not by a parent's failure to comply with a specific step. See, e.g., General Statutes § 17a-11, § 17a-111b; § 46b-129(k)(2).
In responding to this aspect of Daniel G.'s argument, the court does not condone the respondent father's failure to comply with a court order, DCF's attempt to shield itself from the provision of reasonable efforts by ostensible reliance upon Daniel G.'s lack of cooperation in the execution of releases, or the failure of either party to request a hearing to resolve this issue long prior to the TPR trial. However, the clear and convincing evidence establishes that Daniel G. received appropriate referrals to services from a wide number of agencies while DCF was engaged with his family, as fully set forth above and in Part I.C. The record abounds with clear and convincing evidence establishing that DCF adequately complied with its statutory obligation to provide reasonable efforts at reunifying Daniel G. and his daughter, and further establishes that the respondent father was unable or unwilling to benefit from such efforts. Under these circumstances, and in the absence of relevant law supporting the respondent father's argument, the issue of the releases can have no measurable effect upon the petitioner's ability to meet its burden of proving compliance with § 17a-112(j)(1).
Daniel G. may claim that DCF failed to provide reasonable efforts at reunification in his case because the agency failed to fully adhere to the recommendations made by Dr. Grant-Hall in her November 2001 report, by failing to provide him with a list of expectations to complete within the next six months. However, this argument must fail because the evidence clearly and convincingly establishes that those expectations were incorporated, verbatim, into the specific steps issued for Daniel G. by the court on December 12, 2001. (Exhibit 20.) Furthermore, as discussed above, it is also clear that Daniel G. was unable or unwilling to comply with Dr. Grant-Hall's stated objectives due to his continued unlawful activity, repeated incarcerations, and persistent substance abuse.
Like Shannon L., Daniel G. may also argue that DCF failed to undertake reasonable efforts at reunification under the analysis utilized in In reVincent B., supra, 73 Conn.App. 637. As with the respondent mother, however, salient factual distinctions, however, render the Vincent B.
result inapposite to Daniel G.'s situation.[56] In Vincent B., the Appellate Court found that other than visitation, "the department had made no efforts at reunification at all" when it could and should have promoted the reunion of the father and child at issue, and that DCF had made a calculated decision "not to engage in further efforts to reunify [the child at issue] with the respondent based on its prior experiences CT Page 2449-v with the respondent . . ." Id., 643. In the present case, DCF met theVincent B. test of extending reasonable efforts to reunite Daniel G. and his daughter, even though the respondent father had failed to succeed with substance abuse treatment in the past. DCF continued its attempts at reunification by offering him the US program in the Spring of 2000; the agency filed the TPR petition only months after that substance abuse treatment provider had dropped Daniel G. due to his fundamental non-compliance with program requirements. DCF provided parenting education through EastConn and proffered repeat drug treatment through US, although Daniel G. declined to participate. Further substance abuse counseling and assessment was available to him through services provided by OAP. Unlike the father in Vincent B., however, Daniel G. failed to cooperate with such services when he was at liberty, and lost the opportunity to access reunification efforts while he was incarcerated. Daniel G.'s inability or unwillingness to benefit from reunification services render his case distinct from Vincent B., which does not dictate the result in the present matter.
As previously noted, our courts have recognized that DCF cannot force a respondent to either participate in services or to finish a program successfully. In re Steven N., supra, 57 Conn.App. 635. Here, as Daniel G. embarked upon rehabilitation programs but failed to adequately complete any of them, and as he has further been found to be unable or unwilling to benefit from reasonable reunification efforts, DCF has met its burden of proving the element set forth in § 17a-112(j)(1) by clear and convincing evidence.
 II.B. STATUTORY GROUNDS FOR TERMINATION — SHANNON L. PARENTAL FAILURE TO REHABILITATE — § 17a-112(j)(3)(B)(i)
The petitioner alleges that Shannon L.'s parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of § 17a-112(j)(3)(B).[57] Shannon L. counters that she has attended to the pivotal elements of the specific steps and has made sufficient progress in rehabilitation to resume a responsible role in her children's lives. As Dalton was found to be neglected on May 28, 1999, and as Sommer was found to be neglected effective June 1, 2000, the critical issue for this court is whether the respondent has achieved rehabilitation in the statutory sense. Applying the requisite legal standards,[58] and construing the statute in accordance with §17a-112(p),[59] the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion that Shannon L. has yet to achieve a sufficient degree of rehabilitation with regard to her underlying substance abuse CT Page 2449-w issues as would encourage the belief that at some reasonable date in the future she could assume a responsible position in either Dalton's or Sommer's life. See In re Daniel C., 63 Conn.App. 339, 354, 776 A.2d 487
(2001); In re Ashley S., supra, 61 Conn.App. 665; In re Sarah Ann K.,supra, 57 Conn.App. 448. First, the psychological evidence in this case clearly and convincingly establishes that Shannon L. has not achieved §17a-112(j)(3)(B) rehabilitation.[60] Dr. Grant-Hall's thorough evaluation and observations, along with her logical, consistent and detailed testimony, fully established that Shannon L. would have to successfully commence substance abuse treatment before she would be ready to deal with treatment for the anxiety and depression that form the second prong of the respondent mother's dual diagnosis.[61] Based on her evaluation of Shannon L., Dr. Grant-Hall credibly opined that if the respondent mother had not made substantial progress in attaining sobriety by the time of trial, her prognosis for any meaningful recovery would be very poor. Dr. Grant-Hall indicated that if Shannon L. was currently testing positive for drug use, this new data would confirm her opinion that the prognosis for Shannon L.'s recovery was poor.[62] Dr. Grant-Hall's trial testimony credibly established that if the respondent mother was still using drugs, in order to reliably confirm her ability to maintain sobriety and to safely care for her children, Shannon L. would be required to undergo detox, followed by a thirty to sixty-day period of inpatient substance abuse treatment, followed by residential supervision for six months to a year.[63] After that, Shannon L. would have to come back into the community on an unsupervised basis, and live drug-free for six additional months before it would be appropriate to attempt reunification with the children. The evidence clearly and convincingly establishes that during the pendency of this case, Shannon L. has never met this reasonable, psychologically sound test of rehabilitation. Additionally, Dr. Grant-Hall emphasized that given their ages and developmental stage, both Dalton and Sommer require a permanent home as soon as possible; from a psychological viewpoint, neither child should be required to wait any longer for their biological mother to gain sufficient control over her substance abuse issues so that she could serve as a responsible caretaker for them. (Testimony of Dr. Grant-Hall.)In re Amneris P., supra, 66 Conn.App. 385 (child should not be further burdened by having to wait for her mother to achieve sufficient rehabilitation).
Second, although three separate sets of specific steps were assigned to guide Shannon L. in achieving rehabilitation, the evidence clearly and convincingly indicates that she has failed to fulfill a number of significant measures.[64] (Exhibits 17, 18, 19.) Each set of steps mandated Shannon L.'s abstinence, yet she continued to use drugs throughout the course of the pretrial and even into the trial period. CT Page 2449-x Each of the steps mandated Shannon L.'s meaningful participation in substance abuse testing and treatment programs, to achieve some measure of reliable control over her heroin addiction and her use of other illegal drugs, and to develop some insight into her mental health issues. Yet as described in Parts I.B. and II.A.1., Shannon L. repeatedly failed to comply with efforts of multiple out-patient substance abuse providers including the HD, CBH, and CPAS, and she failed to follow through with the counseling and twelve-step programs recommended by FFAS. Shannon L. failed to satisfactorily participate in the inpatient substance abuse services proffered at Stonington and the ADRC, and she failed to adhere to the critical follow-up recommendations provided through McDonough House. She failed to cooperate with mental health services extended through Quinnebaug and as recommended by the HD, and failed to continue with psychiatric medication after her in-patient care at McDonough House, thus leaving herself without adequate attention to her mental health needs, even while her substance abuse issues persisted unabated.
Shannon L. failed to comply with other aspects of the specific steps in this case. Each set of steps required Shannon L. to cooperate with DCF and to permit the agency to have adequate access to her home. However, Shannon L. failed to cooperate fully, was inaccessible by telephone on many occasions, and remained unavailable for almost half of the appointments with the DCF social worker. In the months prior to the commencement of trial, Shannon L. failed to attend the Administrative Case Reviews that were scheduled to review the status of her children. Although Shannon L. receives tribal revenues for income, she failed to maintain housing that would be suitable for herself and the children, and often failed to provide DCF with a current address, as required by the steps. As found in Part I.B., even when the FFAS made in-home services and emotional support available to her at her home, Shannon L. failed to make herself available on a number of occasions, impeding the agency rehabilitation services and specifically violating each of the three sets of steps (Exhibits 1, 2; Testimony of Paulette M.)
Third, the empirical evidence reveals that Shannon L. has not yet achieved statutory rehabilitation. She has even failed to make measurable progress in her personal rehabilitation. Specifically, the respondent has been a drug user for many, many years, has been inconsistent in attending substance abuse programs and never followed through with support programs offered to her. "Furthermore, after accepting treatment for substance abuse, the respondent continued to use drugs" even at the time of trial.In re Michael L., 56 Conn.App. 688, 694, 745 A.2d 847 (2000).
Even if Shannon L. could be found to have achieved reasonable progress CT Page 2449-y in attending to her own substance abuse issues, she remains presently unable to care for her children as any degree of sobriety she may have gained "is too fragile and the risk of relapse is too great." In reKasheema L., 56 Conn.App. 484, 489, 744 A.2d 441 (2000). As found in Part I.B., despite being convicted for Prostitution and Conspiracy to commit Larceny in the sixth degree, Shannon L. failed to comply with the conditions of probation imposed by the criminal court. Despite the ramifications for her liberty, Shannon L. used cocaine and heroin, failed to meet with her probation officer, failed to satisfy her obligation to pursue drug treatment through the HD and ADRC programs. Ultimately, Shannon L. was arrested for Violation of Probation. (Testimony of Julie C.) The respondent mother's functioning remains adversely affected by her drug use, despite multiple efforts at substance abuse treatment, and has resulted in her falling asleep at visits with the children in May and July 2002, behavior that was consistent with that which occurred in court during the summer trial days. (Testimony of Paulette M.) It is abundantly apparent that despite all the substance abuse treatment that has been offered, the psychiatric evaluation tendered through HD, and all the rehabilitation programs in which Shannon L. has engaged in the past, she has not yet shown the ability to "maintain sobriety and function independently as an adult." (Testimony of Dr. Grant-Hall.) Although such functioning is a critical element of the capacity to serve as a responsible, caretaking parent, the evidence clearly and convincingly establishes that Shannon L. has never achieved this goal.[65] Here, the empirical evidence shows that Shannon L. has not maintained an "adult level of functioning," and has resisted the proffer of a psychiatric evaluation that would have enhanced her ability to improve her progress as an individual and as a parent.
Based on all the facts presented in this case, the court finds that Shannon L.'s rehabilitation is not foreseeable within a reasonable time.In re Daniel C., supra, 63 Conn.App. 353. In reaching this conclusion, the court has analyzed the respondent mother's relative lack of present rehabilitation as it relates to the children's particular needs for a responsible parent who can provide them with emotional stability, security, and consistency. Even if Shannon L. should now actively engage in rehabilitation, and even if she should make measurable progress in managing her drug addiction according to the schedule proposed by Dr. Grant-Hall or otherwise, those efforts would be "too little and too late" for both Dalton and Sommer given the many years that have passed since their adjudication as neglected children in 1999 and 2000. In re SheilaJ., 62 Conn.App. 470, 481-82, 771 A.2d 244 (2001).
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite some participation in a rehabilitation regimen, CT Page 2449-z Shannon L. remains without the qualities necessary to successfully parent either Dalton or Sommer, and lacks the ability to assume a responsible position in their lives within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Shannon L.'s failure to achieve rehabilitation pursuant to § 17a-112(j)(3)(B).
 II.C. STATUTORY GROUNDS FOR TERMINATION — DANIEL G. PARENTAL FAILURE to REHABILITATE — § 17a-112(j)(3)(B)(i)
The petitioner also alleges that Daniel G.'s parental rights should be terminated because he has failed to achieve rehabilitation within the meaning of § 17a-112(j)(3)(B). Daniel G. counters that he has attended to the pivotal elements of the specific steps, and has made sufficient progress in rehabilitation to resume a responsible role in Sommer's life. As Sommer was found to be a neglected child effective June 1, 2000, the critical issue for this court is whether the respondent has achieved rehabilitation in the statutory sense. Applying the requisite legal standards and construing the statute in accordance with § 17a-112(p), the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion Daniel G. has yet to achieve a sufficient degree of rehabilitation with regard to his underlying substance abuse issues as would encourage the belief that at some reasonable date in the future he could assume a responsible position in Sommer's life. See In re DanielC., supra, 63 Conn.App. 354; In re Ashley S., supra, 61 Conn.App. 665;In re Sarah Ann K., supra, 57 Conn.App. 448. First, the psychological evidence in this case clearly and convincingly establishes that Daniel G. has not achieved § 17a-112(j)(3)(B) rehabilitation, as he persists in a severe, unmitigated denial of his substance abuse issues, even though he clearly continues to abuse illegal drugs. Daniel G.'s psychological testing, reliably performed and reported by Dr. Grant-Hall, clearly indicates his proclivity for drug addiction problems; these tests are fully consistent with those substance abuse assessments in which Daniel G. deigned to participate during the period of his involvement with DCF and the OAP. An arrest for Possession of Narcotics in January 2002, Positive drugs tests throughout the winter of 2002, along with a detox admission to SCADD under the direction of the criminal court, are all fully consistent with Dr. Grant-Hall's testing. It is elementary that untreated, pervasive substance abuse is a condition that is inimical to responsible parenting. Unfortunately, from a psychological standpoint, Daniel G. is fundamentally unable or unwilling to recognize his own serious drug problem. Without that recognition, his continued refusal to accept counseling or substance abuse treatment is likely to continue, CT Page 2449-aa with continued ill effect on this respondent's capacity to parent Sommer, or any other child who, at a tender age, requires continued supervision, nurturing, and absolute care. In re Amneris P., supra,66 Conn.App. 385.
Second, although specific steps were assigned to assist Daniel G. in achieving rehabilitation, the evidence clearly and convincingly indicates that he has failed to fulfill a number of significant measures.[66] As fully set forth in Part I.C., although the steps specifically prohibited him from additional involvement with the criminal justice system, Daniel G. engaged in a pattern of repeated criminal activities during the years that DCF has been involved with his family. When he was not incarcerated, he violated the conditions of probation to which he was subject, failed to obey court orders to appear as scheduled, and thus acquired additional involvement with the criminal justice system, all in violation of the specific steps.[67]
Third, the empirical evidence reveals that Daniel G. has not yet achieved a sufficient degree of insight or skills necessary to enable him to live in a peaceable and safe manner in the future, integral to serving as a safe caretaking parent for a young child such as Sommer. Daniel G. failed to cooperate with the conditions of his probation that called for meaningful participation in substance abuse rehabilitation at SCADD, or even drug testing at New Perceptions.[68] Even as he persists in denying the severity of his own drug use, Daniel G. has been unable or unwilling to acknowledge the debilitating state of drug use manifest in his partner, Shannon L. His personal functioning remains adversely affected by his drug use, despite the extension of opportunities for substance abuse treatment. In child protection matters, even as it is appropriate for the court to consider a parent's potential for rehabilitation, the court should also consider the potential that he will not appreciably improve his ability to assume a responsible caretaking role for his child, but will continue to lack parenting capacity. See Inre Michael D., 58 Conn.App. 119, 124-25, 752 A.2d 1135, cert. denied,245 Conn. 911, 759 Conn. 505 (2000). Given his history of persistent criminal activity, his past record of failing to respond to court orders, and his unaddressed substance abuse problem, there is every reason to anticipate that Daniel G.'s behavior in the future will continue as it has in the past, with arrests and periods of incarceration that will render him unavailable to care for his daughter.[69]
Based on all the facts presented in this case, the court finds that Daniel G.'s rehabilitation is not foreseeable within a reasonable time.In re Daniel C., supra, 63 Conn.App. 353. In reaching this conclusion, the court has analyzed the respondent father's relative lack of present CT Page 2449-ab rehabilitation as it relates to Sommer's particular needs for a responsible parent who can provide her with emotional stability, security, and consistency. Even if Daniel G. should now actively engage in rehabilitation and even if he should succeed in curbing his behaviors involving substance abuse and criminal activity, those efforts would be "too little and too late" for Sommer given the more than two and a half years that have passed since her adjudication as a neglected child in June 2000. In re Sheila J., supra, 62 Conn.App. 481-82.
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite some participation in a rehabilitation regimen, Daniel G. remains without the qualities necessary to successfully parent Sommer and lacks the ability to assume a responsible position in her life within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Daniel G.'s failure to achieve rehabilitation pursuant to § 17a-112(j)(3)(B).
 III. THE CHILDREN'S PLACEMENT
The respondents join in asserting that DCF cannot prevail in this matter because the agency did not investigate or consider Sheila L., Shannon L.'s sister as a placement for Dalton and Sommer.[70] Brief of Respondent, Shannon L. dated September 5, 2002 (Mother's Brief); Respondent-Father's Memorandum of Law dated September 6, 2002 (Father's Brief). As the petitioner has countered, however, "[t]here is no statutory or federal mandated obligation to investigate and utilize family members as placement resources." Petitioner's Brief, dated September 6, 2002. In addition, the evidence clearly and convincingly establishes that it would have been inappropriate, in this case, to have placed the children with Sheila L. even if she had been considered as a placement resource. Accordingly, the court declines to grant the respondents the relief they have requested.
In Connecticut, the placement of committed children is largely governed by General Statutes § 46b-129(j).[71] The text of § 46b-129(j) does not mandate any particular election of placement alternatives. Rather, the statute's language is clear and unambiguous, written in the disjunctive, and plainly vests the commissioner with the discretion to choose from a number of alternative classifications of placements for children who are committed to her care.[72] See, e.g., James L. v. Commissioner ofCorrection, 245 Conn. 132, 142, 712 A.2d 947 (1998); see generally In reCorey E., 40 Conn.App. 366, 671 A.2d 396 (1996). In this matter, the evidence clearly and convincingly discloses that the first of the listed statutory alternatives was utilized, so that upon commitment Dalton and CT Page 2449-ac Sommer were placed in residence at a "suitable foster home."
Despite the clear, disjunctive language of § 46b-129(j), the respondent parents urge the court to find that the petitioner was mandated to elect the second alternative, and thus to place the children in the home of a person to whom they were "related by blood." Although such a construction is not supported by the text of the statute at issue, the respondents argue that Sheila L.'s home was the only appropriate placement for Dalton and Sommer because DCF is under an obligation to promulgate certain specified plans and regulations dealing with relative placement. This argument is an invalid effort to bundle up the commissioner's duty to elect a safe placement for committed children with unrelated legislative provisions that establish the protocol for the child protection agency's procurement of federal funding. In the absence of an adequate basis at law, the court declines to accept this aspect of the respondent parents' submission.
The respondents profess that DCF is obligated to consider relative placement and to elect such placement over non-relative foster care, because this practice is required by the federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq. Certain aspects of our child protection legislation have indeed been enacted in order to take advantage of funding available to the states upon compliance with the federal Adoption Assistance and Child Welfare Act. See, e.g., In re BabyGirl B., 224 Conn. 263, 289, 618 A.2d 1 (1992). The fact that "federal incentives contribute to the enactment of state legislation" does not, however, mean that Connecticut statutes are required to mimic, in full the expressed federal policies. Id.
Despite the fervor of the respondent parents' argument to the contrary, our appellate courts have consistently held that the federal law in question "is an appropriations act and does not apply to individual actions or judicial findings . . . but merely sets forth general guidelines for a state's continued eligibility to receive funds for foster care maintenance." Id., citing In re Cynthia A.,8 Conn.App. 656, 664-65, 514 A.2d 360 (1986). The provisions of the federal Adoption Assistance and Child Welfare Act, therefore, have no bearing on the question of how the commissioner is accomplish the placement of a child in DCF custody, although it may control Connecticut's continued "eligibility to receive funds for foster care maintenance," set aside through congressional mandate. In re Eden F., supra,250 Conn. 692-93, citing In re Cynthia A., supra, 8 Conn.App. 664.
The respondents also profess that DCF is obligated to consider relative placement and to elect such placement over non-relative foster care, CT Page 2449-ad because this practice is reflected in the agency's own policy manual.[73]
Such internally-promulgated standards may serve as an appropriate guide for DCF's operation, providing some evidence of the manner in which the agency is supposed to conduct its operations. However, breach of those standards neither gives rise to a private cause of action, nor serves as an affirmative defense to a termination proceeding. In re Eden F.,supra, 250 Conn. 692-93. "A general statement of public policy underscoring the desirability of maintaining the integrity of the family unit, however, cannot trump the plain and unambiguous language of the statutory provision detailing with specificity the substantive rights of the parties to a termination proceeding." Id., 693. Here, any practices or standards promoted through DCF's publications must fall beside the "trump" represented by the plain and unambiguous language of § 46b-129(j), setting forth the alternative placements from which the commissioner may select when designating foster care for a child in her custody.
Even if it is determined that DCF was obligated to consider and attempt to implement relative placement in this case, the evidence clearly and convincingly establishes that DCF made reasonable efforts to do so, under the circumstances of this case. DCF considered placing the children with Pat G., Sommer's paternal grandmother, who had expressed interest in serving as a resource for her granddaughter and Dalton as well. However, Pat G. failed to make recommended adjustments to her home, and did not complete the paperwork necessary to effectuate the children's safe transition to residence with her. Accordingly, DCF reasonably discontinued considering Pat G. as a placement option. Although Shannon L. requested that DCF consider her maternal aunt as a placement resource, this relative never expressed a desire to care for the children, and DCF reasonably determined that she lacked appropriate interest in either Dalton or Sommer.[74] (Exhibit 1.) There is no evidence from which the court could reasonably conclude that either Shannon L. or Daniel G. promoted the use of Sheila L. as a placement resource, prior to the immediate pre-trial period.
In the event that it is determined that DCF was under an absolute duty to consider Sheila L. as a relative placement resource, the court makes the following additional findings of fact. Sheila L. admits that although she knew that Dalton had been removed from Shannon L.'s care in March 1999, she did not then offer herself as a placement resource.[75]
Sheila L. explains that she was under the erroneous assumption that Shannon L. was "getting better" from her substance abuse issues during the period when the respondent mother was the subject of DCF's attention. Inconsistent with that assumption, however, Sheila L. admits knowing that Shannon L. was using drugs in June 1999 when Sommer was born, and further admits her knowledge that Shannon L. persisted in using CT Page 2449-ae drugs while she was serving as a caretaker for both children.[76]
Sheila L. further admits that she knew that Shannon L.'s children were taken into DCF custody in March 2000 due to her sister's continued drug use. Again, however, she did not proffer herself as a placement resource at that time. (Testimony of Sheila L.)
Sheila L. claims that, in the past, she made several unrequited phone calls and visits to the DCF office in Willimantic;[77] during the summer of 2002, while the TPR trial was imminent, she actively but unsuccessfully attempted to join the litigation.[78] It is obvious that Sheila L. loves her sister, and that she now wishes to help her in this matter. However, the clear and convincing evidence impels the determination that for some time, Sheila L. effectively condoned Shannon L.'s continued care and custody of Dalton and then Sommer, even while she was actively using drugs. (Testimony of Sheila L.) The evidence does not permit the court to discern whether it was Sheila L.'s love for her sister or her own personal life and family demands that clouded her eyes to Dalton's and Shannon's needs.
Under all the circumstances, the court is constrained to conclude that although DCF should have responded to Sheila L.'s inquiries in a timely manner, any harm that may have been caused by the agency's failure to do so is far outweighed by the evidence establishing that she lacks the degree of interest, judgment and objectivity necessary for service as an appropriate caretaker for Dalton and Sommer. Accordingly, the court infers that even if DCF was obliged to consider her as a resource for the children in the context of this case, she would not have met the agency's criteria as a relative placement.[79]
 IV. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child[ren]." (Citation and quotation marks omitted.) Inre Quanitra M., supra, 60 Conn.App. 103; see also In re Valerie D.,223 Conn. 492, 511 and n15, 613 A.2d 478 (1992). In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
 IV.A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112(k) based upon the clear and convincing evidence presented at trial; and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. CT Page 2449-af See In re Jonathan G., 63 Conn.App. 516. Such findings are required only as to Shannon L. and Daniel G., in light of John G.'s valid consent to TPR. § 17a-112(k).
 IV.A.1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(k)(1)
As identified in Parts II.A.1. and II.B., multiple timely and appropriate services were offered to Shannon L., including visitation; transportation assistance for visits and methadone services; psychiatric services and individual counseling to address mental health issues through McDonough House, Quinnebaug, and through the HD's referral; substance abuse assessments and treatment through CBH, HD, CPAS, and New Perceptions; in-patient treatment for substance abuse and mental health issues at ADRC, Stonington, McDonough House and Quinnebaug; parenting education and service referrals for substance abuse treatment and mental health counseling through FFAS; and parenting classes through EastConn. Furthermore, as found in Part II.A.1., the court has determined that Shannon L. is unable or unwilling to benefit from reasonable reunification services.
As identified in Parts II.A.2. and II.C. multiple timely and appropriate services were offered for Daniel G., including: visitation; assistance with transportation to visits; and substance abuse services through US and SCADD. Daniel G. completed parenting classes offered through EastConn, and was offered case management assistance through FFAS. (Exhibit 1.) Furthermore, as found in Part II.A.2., the court has determined that Daniel G. is unable or unwilling to benefit from reasonable reunification services.
 IV.A.2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — § 17a-112(k)(2)
As identified in Parts II. and III., DCF made reasonable efforts to reunite the family by providing timely services pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. Furthermore, DCF made reasonable efforts to prevent the removal of both Dalton and Sommer from the respondent's home. As found in Part II. A., neither Shannon L. nor Daniel G. is able or willing to benefit from reasonable reunification efforts.
 IV.A.3. COMPLIANCE WITH COURT ORDERS — § 17a-112(k)(3)
Specific steps were ordered for Shannon L. on May 28, 1999; February 16, 2000 and again on December 12, 2001. As set forth in Part II.B., she CT Page 2449-ag failed to adequately comply with these court orders. In addition, as found in Part I.B., although Shannon L. was placed on probation by the court after her December 2001 conviction for Prostitution, she failed to comply with probation criteria in that she did not report to her probation officer and did not cooperate with the referral for drug treatment at the ADRC. Shannon L. also violated the laws of this state when she engaged in Possession of Drug Paraphernalia in May 2002, and violated the laws each time she possessed contraband, even in the course of using the drugs.
Specific steps were ordered for Daniel G. on February 16, 2000 and December 12, 2001. As set forth in Part II.C., he failed to adequately comply with these court orders. Furthermore, as fully set forth in Parts I.C. and II.C., Daniel G. repeatedly violated the conditions of probation to which he was subjected by the criminal court, and persistently violated orders to appear in court to face the charges pending against him. See Parts I.C., II.A.2. and II.C.
IV.A.4. THE CHILDREN'S FEELINGS AND EMOTIONAL TIES — § 17a-112(k)(4)
At the time of Dr. Grant-Hall's assessments in November 2001, she determined that Sommer was psychologically bonded to Cherie H., her foster mother, with whom she has lived since she was nine months old. Dalton G. was also noted to be bonded to his foster mother. Both children exhibited a bond with Shannon L. In November 2001, Dr. Grant-Hall also determined that Dalton G. had a strong attachment to Daniel G. but also found that Sommer was comfortable in Daniel G's presence only when Shannon L. was immediately available to her. (Exhibit 16; Testimony of Dr. Grant-Hall.)
 IV.A.5. AGES OF THE CHILDREN — § 17a-112(k)(5)
Dalton was born on June 21, 1996 and is six and a half years old. Sommer was born on June 23, 1999 and is three-and-a-half-years old.
 IV.A.6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES — § 17a-112(k)(6)
As described in Parts I.B., I.C., and Part II., neither Shannon L. nor Daniel G. has made realistic and sustained efforts to conform his or her conduct to even minimally acceptable parental standards. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the children to be reunited. CT Page 2449-ah
 IV.A.7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILDREN — § 17a-112(k)(7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented either Shannon L. or Daniel G. from maintaining relationships with the children at issue in this case although the limitations and restrictions inherent in the foster care system were in effect. As found in Part III., DCF was under no specific obligation to place either child with Sheila L., whom the respondents would prefer to take care of her offspring. The court has further found that Sheila L. lacks the judgment necessary to serve as a responsible parent for Dalton and Sommer. Insofar as the economic attributes of the case are concerned, DCF provided assistance with the respondents' transportation to visits with the children; Shannon L. had income through tribal revenues, as found in Part II.B.; and Daniel G. was able to work in construction, as found in Part II.C. Accordingly, economic circumstances did not interfere with either respondents' ability to maintain a parent-child relationship.
 IV.B. BEST INTERESTS OF THE CHILDREN — § 17a-112(j)(2)
The court is next called upon to determine whether termination of the parental rights of Shannon L. and/or Daniel G. would be in either child's best interests.[80] Applying the appropriate legal standards[81] to the facts which are clearly and convincingly apparent in this case, the court finds this issue in favor of the petitioner.
In determining whether termination of the respondents' parental rights would be in the best interests of Dalton and/or Sommer, the court has examined the multiple relevant factors including the children's interests in sustained growth, development, well-being, stability and continuity of their environment; their length of stay in foster care; the nature of their relationship with their foster parents and biological parents; and the degree of contact maintained with their biological parents.[82] Inre Alexander C., 60 Conn.App. 555, 559, 760 A.2d 532 (2000); In reShyina B., 58 Conn.App. 159, 167, 752 A.2d 1139 (2000). In a matter such as this, the court is further called upon to balance the children's intrinsic need for stability and permanency against the benefits of maintaining a connection with their biological parents. See Pamela B. v.Ment, 244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).
Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in Dalton's or Sommer's best interests to CT Page 2449-ai continue to maintain any legal relationship with Shannon L. or Daniel G. Dr. Grant-Hall, the court-ordered psychological evaluator, had thoroughly evaluated the respondent parents' past histories and prospects for developing healthy, appropriate lifestyles. Within the six-month time frame recommended by Dr. Grant-Hall, neither parent had demonstrated the ability or willingness to adequately address the criteria set forth in Dr. Grant-Hall's recommendations, as incorporated into the December 2001 specific steps. The evidence provides ample basis for the court's acceptance and adoption of Dr. Grant-Hall's trial testimony establishing that both Shannon L. and Daniel G. remain too impaired to serve as responsible parents for the children at issue in this case.[83] The court further accepts and adopts Dr. Grant-Hall's opinion, confirmed by the overall evidence, that the high degree of psychological damage Sommer would suffer if she was moved from her current foster placement would outweigh any benefits to be reaped from attempting reunification with Shannon L. or Daniel G. in the future; and that while Dalton G. would likely suffer confusion and emotional reaction when he learns that Shannon L. will no longer be his legal mother, the benefits of terminating her parental rights far outweigh any transient harm that may be caused. (Testimony of Dr. Grant-Hall.)
The evidence also conclusively establishes that it would not be in Dalton's best interests to maintain any relationship with his biological father, John G. This respondent, a member of the Creek Tribe, has spent at least a portion of his adult life incarcerated in Oklahoma. He has a long history of abusing alcohol and "speed." He has not maintained any relationship with his son and has not inquired about Dalton's status (Exhibit 2.) John G.'s consent to the termination of his parental rights reflects the respondent's recognition that his son's best interests will be served if the child is freed for adoption.
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra, 250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn.App. 741, 748,596 A.2d 930 (1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276,292, 455 A.2d 1313 (1983). The children's attorney has emphatically submitted that termination of parental rights will serve the best interests of both Dalton and Sommer by providing timely, necessary stability and permanence. Having balanced the children's intrinsic need for a consistent, predictably safe and stable environment against the benefits of maintaining a connection with Shannon L., Daniel G. and/or John G. and having considered the clear and convincing evidence in this CT Page 2449-aj case, the court is obliged to conclude that these children are entitled to the benefit of ending, without further delay, the long period of uncertainty as to whether their biological parents will ever be functionally available to serve as their caretakers. Pamela B. v. Ment,supra, 244 Conn. 313-14.
Accordingly, with respect to the best interests of the children contemplated by § 17a-112(j)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Shannon L., Daniel G., and John G. will serve the best interests of the children Dalton G. and Sommer G.
 V. ORDER OF TERMINATION
WHEREFORE, after due consideration of the children's sense of time, their need for a secure and permanent environment, the relationship they have developed with their foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the children's best interests, the court issues the following ORDERS:
That the parental rights of Shannon L. and John G. are hereby terminated as to Dalton G.
That the parental rights of Shannon L. and Daniel G. are hereby terminated as to Sommer G.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for these children for the purpose of securing an adoptive family or other permanent placement for them.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law.
That primary consideration for adoption of Dalton and Sommer shall be offered to their current foster parents, and that they shall be placed and/or adopted as siblings.
BY THE COURT,
N. Rubinow, J. CT Page 2449-ak